676 P.2d 817

**GAS COMPANY OF NEW MEXICO, A DIVISION OF SOUTHERN UNION COMPANY, a Delaware corporation, Appellant,**

v.

**NEW MEXICO PUBLIC SERVICE COMMISSION, Appellee,**

*Attorney General of the State of New Mexico, Intervenor.*

No. 14435.

Supreme Court of New Mexico.

Jan. 4, 1984.

Rehearing Denied March 1, 1984.

Kate M. Southard, Albuquerque, Montgomery & Andrews, Seth D. Montgomery, Thomas W. Olson, Santa Fe, for appellant.

Patrick Ortiz, Com'n Counsel, Charles F. Noble, Staff Counsel, NM Public Service Com'n, Santa Fe, for appellee.

Paul Bardacke, Atty. Gen., Suedeen G. Kelly, Asst. Atty. Gen., Santa Fe, for intervenor.

OPINION

PAYNE, Justice.

This appeal challenges Public Service Commission's decision to impute as income to Gas Company 75% of Southern Union Refining Company's (SURCO's) gross revenue from the sale of liquid gas, thereby reducing the cost of gas charged to utility customers.

Gas Company purchases natural gas at the wellhead. But the gas contains impurities, heavier hydrocarbons, which condense in high pressure transmission lines, sometimes causing operational difficulties. To remove impurities, the gas is processed by SURCO, an affiliate of Gas Company.

Heavier gases are separated by condensation. However, only one-seventh of the condensed liquid gas (NGLs) is extracted for quality purposes; the rest is extracted because it is profitable. The NGLs, primarily propane and ethane, are sold at two and one-half to three times the price of gaseous methane, which is sold to utility customers.

This action arose when Gas Company petitioned to modify SURCO's payment agreement. The Commission and the State Attorney General objected, contending the present terms were unreasonable. Under the present agreement, the price paid by SURCO for fuel (btu's used in processing) and shrinkage (btu's removed from the gas stream in NGLs) is similar to that paid by any utility customer for btu's consumed. In the Commission's order, the price arrangement is described as follows:

> At its Lybrook plant, SURCO buys wet gas from GASCO [Gas Company] for the purpose of extracting certain entrained liquids. In return for the right to process the gas, SURCO pays GASCO the average wellhead cost for the gas SURCO uses in processing, plus a gathering charge.

The Commission decided that the existing agreement is unreasonable, concluding:

> [T]he agreement between them [GASCO and SURCO] does not fairly, justly and reasonably compensate GASCO, and that the contract is not reasonable as to cost and conditions, and does not effectively preclude the possibility of cross subsidization between GASCO's utility operations and SURCO's processing operations....

The Commission's conclusion relied on a study by an expert witness, Dr. Kirsch, which showed:

> [W]hen SURCO's overall net natural gas liquid [NGL] revenues per MCF of gas processed at Lybrook were compared with the average net NGL revenues of five interstate pipelines, SURCO's revenues were found to be larger. In 1980, SURCO derived approximately $2,298,678 more in net revenues than an aver-

age interstate pipeline would have by processing the same amount of gas, under arms-length agreements.

The evidence also shows that in 1980, for the 21.34 million MCF of gas processed at Lybrook, GASCO received approximately $2,702,067 less from SURCO than if GASCO's contract reimbursed it at the same rate which, on the average, a comparable interstate pipeline received from its gas processors.

A New Mexico gas consumer's utility bill has two components: first, a service charge; and second, a cost of gas factor. Under this latter factor, the consumer pays the cost of purchasing, gathering, and transporting the gas *MINUS any revenues Gas Company receives from processors* for the sale of NGLs. *N.M. Pub. Serv. Comm'n Gen. Order No. 36.* The Commission found that Gas Company received $2.7 million less revenue than it should have from processors. Accordingly, the Commission ordered that 75% of SURCO's gross revenues be imputed to Gas Company to compensate it in closer conformity with the gas processing industry, and decreasing the cost of gas factor.

## I.

Gas Company contends that the Commission employed an erroneous legal standard to find the payment agreement unreasonable. It alleges that the only correct standard is whether cost allocations prevent cross-subsidization and the Commission cannot look at SURCO's profits.

The Commission's authority to review transactions between an affiliate and the public utility is not limited to reviewing cost allocations. This conclusion is based on our interpretation of the legislative grant of authority. The Commission has jurisdiction to review a *Class I* transaction, which is defined as:

> [T]he sale, lease or provision of real property, water rights or other goods or services by an affiliated interest to any public utility with which it is affiliated, or *by*

*a public utility to its affiliated interest.* (Emphasis added.)

NMSA 1978, § 62–3–3(J) (Cum.Supp.1982). Gas Company is a division of Southern Union Corporation, which is the parent company of SURCO. The same Board of Directors presides over all three companies. The shared decision-making process makes Gas Company and SURCO an affiliated interest. Hence, the sale of natural gas by the public utility to its affiliate is subject to agency review. The Commission's power of review extends to the following components of the affiliate transaction:

 B. In order to assure reasonable and proper utility service at fair, just and reasonable rates, the commission may investigate:

 (1) *Class I* transactions to determine the reasonableness of the *cost and contract conditions* to the utility in any such transaction.

 \* \* \* \* \* \*

 D. The commission may issue such orders in connection with an evidentiary proceeding involving a public utility as it finds appropriate and necessary to assure that appropriate *cost allocations* are made and that *no cross-subsidization* occurs between the utility and an affiliated interest. (Emphasis added.)

NMSA 1978, § 62–6–19 (Cum.Supp.1982).

The primary purpose of extending jurisdiction to *Class I* transactions was to protect against cross-subsidization. The danger results from the shared decision-making process by which the utility may be able to allocate some of the profits of its regulated service to its unregulated affiliate. R. Posner, ECONOMIC ANALYSIS OF THE LAW, § 12.3, at 259 (2d ed. 1977). For example, in *Maestas v. New Mexico Public Service Commission*, 85 N.M. 571, 514 P.2d 847 (1973), this Court recognized that there was a possibility of abuse between the parent, Gas Company and its producing subsidiary. There, the parent could negotiate contracts with its subsidiaries at favorable rates, and thereby accrue hidden profits. However, the likelihood of

harm was mitigated by the fact that the parent and its producing subsidiary were zon-affiliated. The producer sold its gas to other companies rather than to the parent. However, in a *Class I* transaction where Gas Company sells to its affiliate, the possibility of harm is real. Therefore, the Commission can review all contract provisions to insure that they do not adversely affect rates charged by the utility. The utility's profit was not the Legislature's concern because the Commission adjusts rates to provide an allowed guaranteed return. The danger is that the affiliate or parent may accrue hidden profits.

To prevent cross-subsidies, the Legislature, in Section 62–6–19, subjected all contract terms to scrutiny, including the price term. SURCO's revenues, as compared with other gas processors, is one viable indicia of whether the price charged by Gas Company is reasonable. This conclusion is especially true in light of the trade practice of setting price as a percentage of the processor's gross revenues.

 Accordingly, we hold that the Commission's power to review contract conditions includes an inquiry as to whether a fair and reasonable price is paid by SURCO for NGLs purchased. And the Commission had authority to impute income to Gas Company for ratemaking purposes, an approach we specifically authorized in *Maestas. See City of Charleston v. Public Service Commission,* 95 W.Va. 91, 120 S.E. 398 (1923) (The utility sold gas to its affiliates at a price considerably below that charged other wholesale customers. The court ordered that the utility's income be increased, at least in accounting, to reflect the higher price.); *Cf.* Annot., 16 A.L.R. 4th 454, § 11(b) (1982).

Gas Company also argues the Commission placed utility customers in the role of investors by imputing a portion of SURCO's gross revenues to Gas Company's income and by erroneously requiring a utility to charge its customer, SURCO, for its subjective value of service rather than for the cost of service.

We agree that a utility customer is not a partner or beneficiary of the utility and does not share the profits or risks of the utility or its affiliate. In this regard, we follow the United States Supreme Court in *Board of Public Utility Commissioners v. New York Telephone Co.*, 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808 (1926), where it stated:

> The customers are entitled to demand service and the company must comply. The company is entitled to just compensation and, to have the service, the customers must pay for it. The relation between the company and its customers is not that of partners, agent and principal, or trustee and beneficiary. (Citation omitted.) ... [Rather], Customers pay for service, not for the property used to render it.... By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company.

*Id.* at 31–32, 46 S.Ct. at 366.

We also agree that a customer who receives service from the utility should not pay for its subjective value. If it did, prices would vary significantly between residential and commercial customers, and even between commercial customers using btu's in a manufacturing process, and customers using them to heat an office; the difference in price due to the usefulness to each customer. Such rate discrimination is prohibited by NMSA 1978, Section 62–8–6 (Cum.Supp.1982). But we find that the Commission did not charge SURCO a subjective value for services, nor did it grant customers an entitlement to Gas Company's profits. Instead, by requiring a portion of SURCO's gross revenues imputed to Gas Company's income, the Commission only mandated that SURCO pay a fair and reasonable price for NGLs extracted from the gas stream.

We find there is no merit to Gas Company's claim that the wrong legal standard was applied in evaluating the reasonableness of its transaction with SURCO.

## II.

After concluding that the contract was evaluated by the appropriate legal standard, we next decide whether the Commission's finding that Gas Company was inadequately compensated and order requiring 75% of SURCO's gross revenue to be imputed to Gas Company were reasonable. When reviewing appeals from administrative bodies this Court's inquiry has consistently been limited to whether the administrative body acted fraudulently, arbitrarily or capriciously; whether the order was supported by substantial evidence; and generally, whether the action of the administrative body was within the scope of its authority. *Llano, Inc. v. Southern Union Gas Co.*, 75 N.M. 7, 399 P.2d 646 (1965). In this instance, the sole issue is whether the Commission's order was reasonable, which finding requires that it be supported by substantial evidence. *Rinker v. State Corp. Commission*, 84 N.M. 626, 506 P.2d 783 (1973); *Llano, Inc.*, 75 N.M. at 14–15, 399 P.2d at 651; *Transcontinental Bus System v. State Corp. Commission*, 67 N.M. 56, 352 P.2d 245 (1960). Substantial evidence requires that we review the whole record instead of refusing to consider evidence unfavorable to the findings. *Duke City Lumber Co. v. New Mexico Environmental Improvement Board* (1983).

The reasonableness of the Commission's finding that Gas Company was not fairly, justly and reasonably compensated is supported by the expert testimony of Dr. Kirsch. Gas Company argues his sample, upon which his expert opinion was based, was not representative because it only included five companies. Further, Gas Company speculates that the differences in revenue earned may be due to different contract provisions, or differing efficiency of the respective processing plants.

Although five companies, quantitatively, is a small sample, it represents 7.5% of the total U.S. production of NGLs. The sample was derived by representative, statistical means. Furthermore, Gas Company's own expert witness based testimony on only six

companies studied. In addition, Gas Company did not present evidence of a more representative sample, nor of a different conclusion derived by some other means. Mere conjecture and inuendo do not create a legitimate inference casting doubt on the representative sample, and are insufficient to meet Gas Company's burden of proof to annul the Commission's order. *Cf. Alto Village Services Corp. v. New Mexico Public Service Commission,* 92 N.M. 323, 587 P.2d 1334 (1978).

■ We find that Dr. Kirsch's testimony was evidence from which the Commission could reasonably infer that Gas Company did not receive a fair and reasonable price for the NGLs purchased by SURCO.

We recognize that a fair and reasonable price demanded of a regular customer must be "just and reasonable" and for "adequate, efficient and reasonable service." NMSA 1978, §§ 62-8-1, -2. Due to Gas Company's monopoly position, a rate is set so that it compensates the utility for the cost of service and a reasonable return on invested capital. These rates, which basically recover cost, are the maximum the public utility can charge a utility customer. R. Posner, *supra,* § 12.2, at 254-55.

However, the Commission acted reasonably in finding that SURCO did not fairly compensate Gas Company by paying only cost plus a reasonable return as a regular ratepayer. SURCO is different from a ratepayer in that the ratepayer purchases btu's to consume heat energy for personal convenience or business. On the other hand, SURCO purchases gas for the NGLs content. Shrinkage removes the btu's in the gas stream, but the energy is not consumed. Energy is converted into a liquid form and resold at a substantial profit. Natural gas is SURCO's primary raw material, some of which is consumed in processing. However, the primary purpose for purchasing the gas is not to consume it, rather to resell the entrained NGLs.

The unreasonableness of Gas Company's assertion that "cost plus" is a fair price is depicted by the allocative function of pricing. Assume all gas processors are entitled to have access to the wet gas gathered from the wellhead by Gas Company. How would the processing rights be allocated? In the market, people have to back up their value assertions with money. R. Posner, *supra,* § 19.1 at 402. The market operates like an auction: the *highest* bidder would receive the opportunity to earn the $18.8 million in gross revenue paid SURCO. If SURCO only bid cost for the processing rights, a competing processor would have most likely won the bid, and taken the processing rights. But the market was precluded; there was no bidding, and the Commission noted that there is no evidence that SURCO even paid for the rights, nor was the assignment of all rights approved by the agency. Instead, it appears that the affiliate relationship was the sole basis for allocating the rights to the valuable NGLs.

In addition, we find that the Commission's remedy of imputing a percentage of SURCO's gross revenue to Gas Company's income from gas processors for rate-making purposes is reasonable in light of evidence of the gas processing trade practice. Gas Company's own market survey shows that 83.7% of seventy-two contracts reviewed set the natural gas owner's compensation, or price, by some measure of economic value of the liquids. Therefore, it was not unreasonable for the Commission to conclude that Gas Company's price must take into account the perceived economic worth of the NGLs.

Furthermore, the 75% figure was derived from Dr. Kirsch's study. The Commission held:

> 25. Using the range between $2,298,678 and $2,702,067 as GASCO's revenue shortfall and SURCO's windfall, the evidence indicates that in 1980, GASCO should have been paid approximately 75% *of gross revenues from Lybrook sales.*

This figure was also supported by the fact that during the year SURCO and Gas Company entered into the processing agreement, SURCO paid in excess of 77% of its gross revenues for the processing rights.

We find that the Commission applied the correct legal standard in evaluating the affiliate transaction. Further, the Commission's order finding 1) the existing agreement unreasonable because it fails to fairly, justly and reasonably compensate the public utility, and 2) that 75% of SURCO's 1980 gross revenues be imputed to Gas Company for rate-making purposes, is reasonable because it is supported by substantial evidence. The Commission's order is hereby affirmed.

IT IS SO ORDERED.

SOSA, Senior Justice, and RIORDAN, J., concur.