530 A.2d 936

David M. Barasch, Consumer Advocate, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

Equitable Gas Company, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

Argued April 22, 1987, before President Judge CRUMLISH, JR., Judges CRAIG, MACPHAIL, DOYLE, BARRY, COLINS and PALLADINO.

*Robert P. Haynes, III,* Assistant Consumer Advocate, with him, *David M. Barasch,* Consumer Advocate, for petitioner/intervenor, David M. Barasch, Consumer Advocate.

*Charles E. Thomas, Jr.,* with him, *Thomas T. Niesen, Lawrence B. Nydes* and *Amy M.A. Klodowski, Thomas & Thomas,* for petitioner/intervenor, Equitable Gas Company.

*Mark C. Morrow,* Assistant Counsel, with him, *Daniel P. Delaney,* Chief Counsel, for respondent.

OPINION BY JUDGE CRAIG, August 10, 1987:

David Barasch, as Consumer Advocate, and the Equitable Gas Company cross-appealed from an order of the Public Utility Commission (commission) which permits Equitable to increase its service rates.

On January 4, 1985, the Equitable Gas Company filed Supplement No. 50 to its Tariff Gas-Pa. PUC No. 20. Equitable's filing proposed changes in its rates, rules and regulations to produce an increase in annual revenues of $36,372,000 for retail gas service. The commission suspended Supplement No. 50 and began an investigation of the proposed rate change.

On March 1, 1985, Equitable filed, pursuant to section 1307(f) of the Public Utility Code, 66 Pa. C. S. §1307(f), an addendum to Tariff Gas-Pa. PUC No. 20, to become effective September 1, 1985. With that filing, Equitable sought to recover purchased gas costs including gas cost experienced during the period July 1, 1983 through December 31, 1984 and projected costs estimated to be incurred during the period September 1, 1985 through August 31, 1986.

The commission consolidated hearings relating to investigations on both filings before Administrative Law Judge KLOVEKORN.

On August 29 and September 30, 1985, the commission issued orders which authorized Equitable to recover $353,000,634 in Pennsylvania jurisdictional operating revenues, excluding state tax, adjustment

surcharge and gas cost revenues. This order increased the company's annual revenues by $26,007,000.

The Consumer Advocate contends that the commission improperly refused to deduct, from Equitable's rate base, cash working capital supplied by ratepayers and that the commission failed to recognize that the amount of "unaccounted-for gas" which Equitable claims as an expense is excessive. Equitable counters those contentions of the Consumer Advocate, and, in a cross-appeal, maintains that the commission erred in adopting a $417,000 adjustment to net income from the test year for Equitable's "rate 5" sales. Equitable also contends that the commission's decision to defer its analysis of Equitable's transportation revenues until Equitable's next rate case was in error.

Our scope of review in this case is limited to a determination of whether there has been a constitutional violation, an error of law or whether the findings of fact are supported by substantial evidence. *Barasch v. Pennsylvania Public Utility Commission*, 507 Pa. 561, 493 A.2d 653 (1985).

## A. CONSUMER ADVOCATE'S APPEAL

### 1. *Cash Working Capital*

Cash working capital is the amount of cash required to operate the utility between the rendition of service and the receipt of payment. *City of Pittsburgh v. Pennsylvania PUC*, 370 Pa. 305, 88 A.2d 59 (1952). Where investors supply funds to the utility to bridge the gap between the time the service is rendered and payment for that service is received, the utility has a "positive" cash working capital requirement. Conversely, where a utility receives payment for services before it must satisfy a corresponding liability, the utility has a "negative" cash working capital requirement.

Equitable's proposed rate increase is based, in part, on a positive cash working capital requirement of $2,312,853—a component of Equitable's rate base. Equitable's cash working capital requirement is based on the number of days before (lead) or after (lag) customer payments are received relative to Equitable's payments for four categories of expenses:

(In thousands)

|  | Total Adjusted Costs | Daily Amount | (Lead) Lag Days | Working Capital Requirement |
|---|---|---|---|---|
| Gas Purchase Costs | $210,302 | $575 | (6.67) | ($3,833) |
| Payroll Costs | 46,266 | 126 | 18.05 | 2,282 |
| Taxes Other Than Payroll | 39,212 | 107 | 18.96 | 2,031 |
| Other Costs | 34,984 | 96 | 19.17 | $1,872 |
|  | $330,764 |  |  | $2,313 |

In his July 31, 1985 recommended decision, ALJ KLOVEKORN reviewed the testimony and other evidence on the cash working capital claim and concluded: (1) that Equitable's calculations did not reflect delays in its payments of accrued interest; (2) that the commission trial staff's proposed elimination of uncollectable accounts as an expense in the "other costs" category should be recognized; and (3) that Equitable overstated its payments of gross receipts taxes.

The commission adopted the ALJ's cash working capital determination, which consisted of a negative value of $5,610,000. The Consumer Advocate contends that the ALJ's recommendation produces a $3,297,147 negative cash working capital requirement as follows:

| Equitable's Positive Cash Working Capital Claim | $2,312,853 |
|---|---|
| Downward Adjustments | -5,610,000 |
| Proposed Negative Cash Working Capital | -$3,297,147 |

However, the commission went no further than a refusal to allow Equitable any rate base *increase* on the basis of a cash working capital requirement. Nevertheless, because a negative cash working capital requirement represents ratepayer-supplied capital, the Consumer Advocate contends that Equitable's rate base should be *reduced* by $3,297,147 in order to prevent ratepayers from paying a return on capital which they have supplied.

The commission rejected the Consumer Advocate's position as follows:

> We have not, at least in recent memory, adopted a negative cash working capital. The record in this proceeding is not sufficiently developed regarding the appropriateness of any cash working capital determination. None of the parties have cited precedent from other jurisdictions on this subject. While we are *not* in agreement with Equitable regarding its constitutional claim, we are not prepared at this time to adopt a negative cash working capital determination. Consequently, we shall provide for a zero allowance.

The commission argues that its adoption of the ALJ's downward adjustments to Equitable's proposed cash working capital requirement is not tantamount to a finding that Equitable's payments lag behind its receipts of revenues. In other words, the commission maintains that reductions in a utility's cash working capital requirement in excess of a positive requirement do not necessarily yield a negative cash working requirement.

The commission, in its brief, identifies practical difficulties in establishing a utility's cash working capital requirement:

> While the concept of positive and negative cash working capital requirements is rather easily understood, their actual calculation can be proble-

matic. Disputes may arise over what sources of capital are available to meet cash working capital needs. . . . Additionally, it may be necessary to perform a lead-lag study of a utility's cash flow to empirically identify the difference in timing between outward cash flow of labor, materials and supplies, inventory, and other expenses, and inward cash flow from charges to customers. (Citations omitted.)

Our review of the record reveals that the ALJ's recommended downward adjustments to Equitable's claimed cash working capital component of the rate base are supported by substantial evidence in the record. Furthermore, we must agree with the commission that the record lacks sufficient evidence (*i.e.* a "lead-lag" study supporting negative cash working capital) to establish a negative cash working requirement clearly. Hence, the commission did not commit an error of law in its refusal to adopt a new policy of negative cash working capital, in view of the absence of sufficient evidence to support such a significant change in accounting practices.

### 2. *Unaccounted-For Gas*

Lost and unaccounted-for gas (UFG) is that volumetric difference between the gas available for sale, *i.e.*, that which is introduced into the distribution system, versus the gas actually recorded by the utility as having been sold to ultimate consumers. *Investigation of Gas Cost Rate No. 5*, Docket No. M-78050055, order entered March 16, 1984 at 10. UFG is significant in the rate-making equation because it is reported as an expense which, in turn, supports the need for additional revenues.

The Consumer Advocate maintains that Equitable's UFG is excessive when compared to other Pennsylvania

gas utilities and that the commission should not permit Equitable to claim its entire UFG as an expense. The commission has, in an earlier order, warned that it might not allow a utility to claim its entire UFG amount if it is "unacceptably high":

> The recovery of the cost of lost and unaccounted for gas is a proper function of the [gas cost rate] formula.
>
> However, our agreement with ALJ SHANE [as to the treatment of unaccounted-for gas] should not be considered as closing the door to a base rate case examination of the issue of where the lost and unaccounted for gas levels are unacceptably high.

*Investigation of Gas Cost Rate No. 5,* at 10. The Consumer Advocate proposes that the commission apply a five percent ceiling to Equitable's claim for UFG. Specifically, the Consumer Advocate argues that the commission should reduce Equitable's cost-of-gas expense by $4,513,000 to reflect only a five percent UFG.

The parties, however, disagree as to what Equitable's true UFG is for test year 1984. Equitable's expert, Mr. Cooke, initially testified that Equitable's actual UFG (total input minus total output) for test year 1984 was 7,110 MMcf, or 8.6% of total gas introduced into the system. (T.R. 604). The Consumer Advocate's expert, Mr. Cotton, testified that Equitable's UFG for the test year was 7.21%. (OCA St. No. 3 at 25). On rebuttal, however, Mr. Cooke stated that Equitable's UFG for the test year was 4.29%. When cross-examined, Mr. Cooke revealed that the 4.29% calculation does not include gas losses due to pressure and temperature variations. (T.R. 1945).

The commission's order adopts the UFG calculations from Mr. Cooke's rebuttal testimony as follows:

> *After defining UFG as the difference between input or supply to a gas system and deliveries*

*from the gas system during a specific time period,* Equitable argues that its UFG for the five twelve-month periods ended August, 1984, was 3.3%, 3.39%, 4.94% 3.97% and 4.29%, respectively. . . .

Given the fact its UFG percentage for 1984 was less than its percentage for 1982, and less than the [Consumer Advocate's] witness' proposed five percent standard, there is no basis for any adjustment for UFG. (Emphasis added.)

The Consumer Advocate argues that the commission's order is inconsistent because the 4.29% UFG calculation, as determined from the cross-examination of Mr. Cooke, is not based on "the difference between input or supply to a gas system and deliveries from the gas system during a specific time period." When UFG consists of input minus output, diminutions of output resulting from temperature and pressure variations necessarily are included within UFG. Mr. Cooke stated, however, that gas losses due to temperature and pressure variations were excluded from the 4.29% calculation of UFG.

Given the commission's own definition of UFG which includes temperature and pressure losses, there is no substantial evidence to support the commission's acceptance of Equitable's UFG calculation under 5% because all the evidence with respect to UFG, when temperature and pressure losses are included, produce a UFG higher than 5%.[1]

---

[1] We note that the commission's apparent misunderstanding as to the basis of the 4.29% UFG calculation may stem from its erroneous conclusion that the Consumer Advocate did not file exceptions to the commission's adoption of the 4.29% UFG. Although the commission's order, on reconsideration, acknowledged the Consumer Advocate's exceptions, the commission did not then proceed with any substantial re-examination of its rather cursory resolution of the UFG issue stated in the original order.

Accordingly, this court must vacate the commission's determinations with respect to the UFG issue and remand for corrected findings and conclusions based on such additional testimony as the commission shall deem necessary.

The new findings should include a confirmed restatement of the definition of UFG; a determination as to the maximum reasonable percentage of UFG allowable with respect to companies such as Equitable in the calculation of rates; a finding as to the amount of UFG attributable to Equitable for the test year in accordance with the definition thus restated; a downward adjustment in the allowable cost of gas recovery to the extent that the UFG determination exceeds the maximum allowable percentage level; and recalculation of the allowable rate increase in accordance with the new findings.

## B. EQUITABLE APPEAL

### 1. *Rate 5 Revenues*

One of Equitable's service rates is designated "rate 5-flexible large volume service (interruptable)." Rate 5 allows Equitable to reduce its rate for large volume natural gas service in order to meet competition from alternative fuel sources such as propane gas and No. 2 and No. 6 fuel oil.

During the test year ending August 31, 1984, Equitable sold 2,155,361 million cubic feet (Mcf) under its rate 5. In its order entered September 30, 1985, the commission adjusted the test year level of rate 5 sales from 2,155,361 Mcf to 3,046,615 Mcf—the level of rate 5 sales during the twelve months ending February 1985, which is an increase of 891,254 Mcf. The commission considered the increased rate 5 sales as an additional source of revenue not formerly reflected in the

test year, thereby reducing Equitable's need for increased revenue by $819,832. The commission held, in pertinent part, as follows:

> The record is clear that rate 5 sales have dramatically increased following the expansion of eligibility for rate 5. The company has offered no evidence that the expansion of rate 5's eligibility and the growth of rate 5 sales are not related. Failure to account for this increase in sales would work to the detriment of the ratepayers because losses are being recognized, but sales gains would not be recognized. We deny the company's exception and adopt the [consumer advocate's] proposed adjustment.

Equitable does not dispute the fact that post-test year rate 5 sales are higher than test year rate 5 sales. However, Equitable objects to the commission's assumption that the increased rate 5 sales are *in addition* to the test year sales at regular tariff rates 3a and 4a. Equitable states that:

> Rate 5 is used to compete with the rates of other gas utilities, as well as other fuels for the purpose of retaining existing load. Rate 5 offers are intended to prevent reductions in existing levels of sales which would otherwise be lost to competition; therefore, no increases in sales are anticipated. Since rate 5 price offers are below the tariff rate which would otherwise be applicable, revenues at existing levels of sales would always decrease. (R. 469a)

In other words, Equitable contends that rate 5 sales displace sales at other rates and therefore do not necessarily represent an increase in net revenues.

The commission argues that its adjustment of Equitable's revenues to reflect increased rate 5 sales is supported by evidence presented by the Consumer Advo-

cate's expert, Mr. Cotton (R. 561a-563a), and that Equitable offered no evidence to rebut the Consumer Advocate's evidence of increased rate 5 sales, other than its contention that rate 5 sales are "displaced" sales.

Our review of the record confirms the commission's argument. Mr. Cotton testified as follows:

Q. What are rate 5 sales and when did the company begin making them?

A. Rate 5 is a flexible rate that allows the Company to offer gas service to certain large customers at a lower price than firm rates. The customers receiving Rate 5 service have alternative commodity supplies at lower prices than Equitable's firm rates. For the most part, these are customers who have the ability to burn alternate energy sources, except coal, or who have access to alternative gas suppliers. Without the ability of Equitable to be able to price at competitive rate 5 prices, gas sales might be lost to oil and alternative gas.

Because the commission's findings concerning rate 5 revenues are supported by substantial evidence in the record, we must affirm.

## 2. *Transportation Revenues*

In *Pennsylvania Public Utility Commission v. Peoples Natural Gas Co.,* (R-832533, filed January 13, 1984), the commission directed major gas distribution utilities to establish rates for the transportation of natural gas. Because Equitable's transportation tariff did not become effective until after the test year, and insufficient data had been collected about actual transportation sales to support a specific revenue adjustment, the consumer advocate's expert, Mr. Cotton, proposed that Equitable's transportation revenues received should be placed in a deferral account until the next rate base pro-

ceeding when the net revenue amount could be amortized. The commission adopted the consumer advocate's deferral approach and preserved the issue for Equitable's next rate proceeding.

Equitable complains that the commission's adoption of the deferral method incorrectly assumes that transportation revenues will be incremental, that is, in addition to normal gas sales. Equitable contends that its transportation service displaces Equitable's sales to existing customers; the effect, therefore, of transporting more third-party gas through its lines instead of its own gas to its customers is not necessarily an increase in net revenues.

Our review of the record reveals very little evidence on the issue of whether Equitable transportation revenues supplement or displace its sales revenues. Consequently, we do not consider the commission's decision to defer adjustment to Equitable's rate base, until such time as more evidence is available, to be an abuse of discretion. We therefore affirm the commission's order directing Equitable to place transportation revenues in a deferral account until the next rate base proceeding.

## C.  CONCLUSION

Accordingly, we affirm the following: (1) the commission's zero allowance of Equitable's cash working capital claim and its rejection of the consumer advocate's proposed negative cash working capital; (2) the commission's recognition of increased revenues due to Equitable's rate 5 sales; and (3) the commission's order directing Equitable to place transportation revenues in a deferral account until the next rate base proceeding. We vacate the commission's order upholding Equitable's claim for unaccounted-for gas and remand for additional

hearings and findings of fact concerning Equitable's unaccounted-for gas consistent with this opinion.

## ORDER

NOW, August 10, 1987, the order of the Pennsylvania Public Utility Commission, entered September 30, 1985 at Pa. PUC Docket No. R-842769 is affirmed, except as to the extent that it recognizes Equitable's claimed expense for unaccounted-for gas, concerning which aspect the order is vacated. The case is remanded for the commission to make additional findings of fact regarding Equitable's unaccounted-for gas claim consistent with this opinion, and to arrive at a new revenue determination accordingly.

---

CONCURRING AND DISSENTING OPINION BY JUDGE PALLADINO:

I agree with the majority's analysis and disposition on the issues of unaccounted-for gas, rate-5 revenues, and transportation costs.

I write separately, however, because I believe that the record is insufficient to form a basis for reaching a legal conclusion as to whether the PUC must adopt the ALJ's downward adjustments in total and thereby impose a negative working cash capital. Accordingly, I would remand for further findings on this important issue.