2000-NMSC-011

998 P.2d 564

In the Matter of the Petition by ZIA NAT-
URAL GAS COMPANY, a division of
Natural Gas Processing Co., to Estab-
lish New Service and Transportation
Rates, Zia Natural Gas Company, a divi-
sion of Natural Gas Processing Co., Ap-
pellant,

v.

New Mexico Public Utility
Commission, Appellee,

and

Mescalero Apache Tribe,
Intervenor–Appellee.

No. 24, 699.

Supreme Court of New Mexico.

March 1, 2000.

Rehearing Denied March 31, 2000.

Simons, Cuddy & Friedman, LLP, Daniel H. Friedman, Santa Fe, Mercedes Fernandez–Wells, Zia Natural Gas Company, Ruidoso Downs, for Appellant.

Stacey J. Goodwin, Commission Counsel, Santa Fe, for Appellee.

Cohen & Cohen, P.A., David S Cohen, Jill Z. Cooper, Santa Fe, for Intervenor–Appellee.

## OPINION

MAES, Justice.

{1} This is an appeal by the Zia Natural Gas Company (hereinafter Zia) from an order of the New Mexico Public Utilities Commission (hereinafter Commission) in a natural-gas utility-rate proceeding. Pursuant to NMSA 1978, § 62–11–5 (1982), under which this Court may affirm or annul an action by the Commission, we are asked to annul and vacate the order of the Commission.

## I. BACKGROUND

{2} Zia is an operating division of Natural Gas Processing, Inc.; both are located in Worland, Wyoming. Zia provides natural gas utility service in Ruidoso and surrounding areas in Lincoln County. Following acquisition of the assets of Jal Gas Co. in 1994 and Hobbs Gas Co. in 1996, Zia also serves Jal and Hobbs.

{3} Zia sought a rate increase of $2,704,158 and was granted an increase of $983,428. Zia raises five issues with regard to the rate proceeding: 1) whether a capital structure can be imputed to Zia; 2) whether the denial of Zia's actual tax expense is contrary to law;

3) whether the overall rate of return on the rate base which includes the rate of return on equity and the rate of return on debt established by the Commission is, on balance, supported by substantial evidence in the record as a whole; 4) whether the Commission's decision to deny Zia any cash working capital is supported by substantial evidence or is a denial of due process; and 5) whether the deletion of over $115,700 in aircraft operating expenses from Zia's rate base is supported by substantial evidence or was a denial of due process. We conclude the Commission's use of an imputed capital structure and the Commission's determination of the rate of return on the rate base are based on substantial evidence. Zia's evidence against use of an imputed capital structure to determine rates is inapplicable to current economic conditions. The Commission's denial of Zia's actual income tax expense was arbitrary and the denial of a cash working capital allowance as an element of the rate base and the reduction of aircraft expense in Zia's rate base from $140,000 to $24,252.92 were not based on substantial evidence. We reverse the decision of the Commission.

## II. STANDARD OF REVIEW

{4} Our statutory authority in rate cases is set out in NMSA 1978, § 62–11–5 (1982). We have no authority to modify the order of the Commission. *See Hobbs Gas Co. v. Public Serv. Comm'n,* 115 N.M. 678, 680, 858 P.2d 54, 56 (1993). Although we do not substitute our judgment for that of the Commission or act legislatively in this matter, we may declare parts of a Commission order unlawful and vacate the order in toto, but at the same time in the interest of judicial economy declare other parts of the order to be lawful. *Id.* The statutory basis for our decision to affirm or annul is whether the decision of the Commission is unreasonable or unlawful. We expounded upon the meaning of unlawfulness in this context in *Morningstar Water Users v. New Mexico Public Utility Commission,* 120 N.M. 579, 582, 904 P.2d 28, 31 (1995). In *Morningstar* we explained the burden of showing unlawfulness or unreasonableness on the appealing party under NMSA 1978, § 62–11–4 (1965). Such

unreasonableness or unlawfulness may be shown by demonstrating the decision: is arbitrary and capricious, is not supported by substantial evidence, or is an abuse of discretion "by being outside the scope of the agency's authority, clear error, or violative of due process." *Morningstar*, 120 N.M. at 581, 904 P.2d at 31. Although we review the whole record to determine whether there is substantial evidence to support the agency decision, we view the evidence in the light most favorable to the decision. *Duke City Lumber Co. v. New Mexico Envtl. Improvement Bd.*, 101 N.M. 291, 294, 681 P.2d 717, 720 (1984).

## III. IMPUTED CAPITAL STRUCTURE

{5} A utility's capital structure is used as a basis in determining the overall rate of return on a utility's investment. In this matter, the Commission, relying on the hearing examiner's recommendation, established a rate of return through the use of an imputed capital structure rather than Zia's actual capital structure. The process which Zia describes as the imputation of a capital structure is in fact a mathematical process through which the Commission determined the overall rate of return. Zia is owned by one investor. Zia currently operates with 100% equity and no debt. Zia argued that its rate base should be figured using a 13% rate of return on 100% equity. Instead, the Commission determined an overall rate of return for Zia using the debt and equity structure of a more typical natural gas company and typical rates of return for such companies on both debt and equity. The Commission used a hypothetical capital structure which included 51.5% common equity, 2 .63% preferred stock, and 45.88% debt (rounded to the nearest one hundredth). This typical capital structure is a less expensive capital structure than Zia's because the rate of return on equity is substantially higher than the rate of return on debt.

{6} Zia contends that the use of an imputed capital structure which included debt was not supported by substantial evidence and was a denial of procedural due process. Zia further alleges it should have been given advanced notice to adjust its capital structure to include a certain percentage of debt.

{7} It is well established that equity financing is more expensive than debt financing. *See State Corp. Comm'n v. Mountain States Tel. & Tel. Co.*, 58 N.M. 260, 277, 270 P.2d 685, 696 (1954) (hereinafter *Mountain States 1954*) (discussing capital structure as the ratio of debt to equity, this Court stated, "[d]ebt capital is substantially less expensive to the operating company than equity capital"). *See also Railroad Comm'n of Tex. v. Entex, Inc.*, 599 S.W.2d 292, 295 (Tex.1980) ("Debt financing or borrowed capital is generally cheaper than equity financing or capital obtained from the sale of stock"); *State v. Southern Bell Tel. & Tel. Co.*, 274 Ala. 288, 148 So.2d 229, 232–33 (1962) (deeming a low debt to equity ratio to be in "the nature of a company luxury not to be reflected in rates to be charged to the public"). A less-than-efficient capital structure which contains excessive equity is properly treated by the Commission as likely to result in higher rates. *South Central Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n*, 594 So.2d 357, 362 (La.1992) (stating that the cost of capital consists of two factors, the cost of debt and the cost of equity; "[t]he first step in estimating the overall cost of capital is choosing the appropriate capital structure for regulatory purposes[;][t]his selection is crucial because, the cost of equity capital is usually higher than the cost of debt capital"). For rate-making purposes the hypothetical capital structure allows rates to be set as though overall cost of capital were based on an optimal ratio of debt to equity in the capital structure of the utility. To determine the proper ratio of debt to equity the Commission must determine each of the two elements of the cost of capital: the cost of debt and the cost of equity. *See City of Pittsburgh v. Pennsylvania Pub. Util. Comm'n*, 182 Pa.Super. 376, 126 A.2d 777, 781 (1956). Because equity is more costly than debt, capital structures should reflect as much debt as possible, though not to the point where the financial integrity of the firm is sacrificed. *See Mountain States 1954*, 58 N.M. at 277–78, 270 P.2d at 696. The overall lower cost of capital for the utility with an efficient capital structure, that is a capital

structure with a reasonable amount of debt, translates into lower rates. While the actual debt ratio carried by the utility is a matter for the utility's management, *id.* at 278, 270 P.2d at 696–97, a capital structure which results in higher than necessary rates is properly treated by the Commission as economically inefficient. In rate making, the Commission may set rates based on an optimum, or at least an average, capital structure. Otherwise, the utility's choice of capital structure would always dictate rates, which would exaggerate the interests of investors over those of consumers. *See* NMSA 1978, § 62–3–1 (1967) (declaring public policy in the interest of consumers and investors to require regulation of utilities).

{8} Our cases have all but explicitly accepted the imputation of a capital structure to a utility company in rate making. *See Gas Co. v. New Mexico Pub. Serv. Comm'n*, 100 N.M. 740, 742, 676 P.2d 817, 819 (1984) (imputing income to utility for undersales of condensed liquid gas to affiliate to protect against cross-subsidization approved); *General Tel. Co. v. Corporation Comm'n (In re General Tel. Co.)*, 98 N.M. 749, 754, 652 P.2d 1200, 1205 (1982) [hereinafter *General Tel. 1982*] (holding it proper for Commission to allocate weighted cost to the elements of capital structure, including debt, to limit return on debt of subsidiary); *Mountain States 1954*, 58 N.M. at 277, 270 P.2d at 696 (using the term debt ratio to mean the proportion of debt to equity in the capital structure, the Court acknowledged a dispute "as to whether rates should be based upon actual debt ratio or an estimated proper debt ratio"). A significant number of jurisdictions have accepted the concept of an imputed capital structure in rate making. *See Communications Satellite Corp. v. FCC*, 611 F.2d 883, 904–05 (D.C.Cir.1977) (collecting cases); *General Tel. Co. v. Idaho Pub. Utils. Comm'n*, 109 Idaho 942, 712 P.2d 643, 646 (1986) (same).

■ {9} The staff witnesses engaged in the imputation process in order to compare Zia with more typical natural gas companies and to determine what the company's situation would be if it operated with a capital structure that was less costly to the ratepayer. Because Zia is not a publicly-traded company, the staff witness calculated the cost of equity for a group of eight comparable gas distribution companies, all of which receive 100% of their revenues from gas distribution activities and are evaluated by Value Line Investor Service, an organization historically relied on by the Commission for accuracy in long-term forecasting. The market price of Zia's stock was estimated in order to evaluate the return on that stock. In addition to computing an average capital structure using the eight companies and imputing that structure to Zia, the staff witnesses also compared Zia to the eight companies. We conclude the Commission relied on substantial evidence in establishing an imputed capital structure for Zia in order to set rates.

■ {10} The Commission has not suggested that Zia adjust its actual capital structure to conform to the imputed structure. Such changes are a matter of internal management prerogative as recognized in *Mountain States 1954*, 58 N.M. at 278, 270 P.2d at 696–97. The actual capital structure, referred to by this Court in *Mountain States 1954* as the "debt ratio," is a matter for management, but the evaluation of the capital structure in setting rates is a matter for the regulator. It is appropriate for the Commission to consider the effect of the actual capital structure on ratepayers and to hypothetically adjust that structure in rate determination to strike a balance between the interests of ratepayers and the interests of investors in achieving a just and reasonable rate of return. *State v. Southern Bell*, 148 So.2d at 232. This seems to be a well-recognized proposition. *See Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944). Because the Commission is not insisting on any change in Zia's management, Zia's argument confuses actual structure with use of a hypothetical structure in establishing a reasonable rate of return. In any case, as *Mountain States 1954*, 58 N.M. at 277–78, 270 P.2d at 696–97 indicates, Zia should have been on notice that a 100% equity capital structure could be detrimental to ratepayers and would not be the basis for setting rates.

## IV. INCOME TAX EXPENSE

{11} Zia claimed $700,000 in income tax expenses. The Commission, using its imputed capital structure, determined that Zia would have been able to deduct $497,000 of the taxes in fictitious interest payments on the 46% imputed debt. As a result, the Commission awarded Zia $391,000 in income tax expenses. Zia complains, however, that while it must in reality pay a high amount of federal taxes on its income, the imputed debt creates false tax savings in the form of a deduction equal to the amount of interest. The savings resulting from this deduction ($309,130) exists only in the hypothetical world of the imputed capital structure. Zia claims the imputed tax savings is contrary to law. We agree. While it is reasonable for the Commission to evaluate the utility in terms of an imputed capital structure for purposes of developing a pattern for comparison with other similarly situated companies, it is not reasonable to carry the imputation of capital structure to the point where the rate is evaluated without consideration of actual taxes paid. We see no reason to depart from case law which has held for many years that a regulatory body cannot arbitrarily disallow federal taxes that a company has paid or is obliged to pay, by assuming a tax savings under a capital structure which does not exist. *See General Tel. Co. v. Michigan Pub. Serv. Comm'n,* 78 Mich.App. 528, 260 N.W.2d 874, 878 (1977) (citing *Public Serv. Comm'n v. Indiana Bell Tel. Co.,* 235 Ind. 1, 130 N.E.2d 467, 480 (1955)). One leading case is *In re Diamond State Tel. Co.,* 51 Del. 525, 149 A.2d 324, 328–329 (1959), which held a utility commission could not arbitrarily disallow legitimate actual tax expenses on the theory of reforming the company's capital structure.

{12} Whereas the use of an imputed capital structure in determining the rate of return appropriately balances the interests of ratepayers and investors and equalizes a management structure that is more beneficial to investors, the refusal to use actual tax expenses determining the rate of return is improper. In other words, the Commission would have been punishing Zia for exercising its management prerogative in making the company more secure for its investor. Once the Commission has established a reasonable rate of return which balances investor and ratepayer interests, it is unnecessary to deny actual tax expenses reasonably incurred because it would shift the balance too far in favor of ratepayers. Zia points out that, even though the Commission determined that 9.15% was a reasonable rate of return, the disallowance of tax expenses reduces the actual rate of return to 7.33%. Cf. *General Tel. 1982,* 98 N.M. at 757, 652 P.2d at 1208 (deducting 41% from the rate of return the commission had determined to be just and reasonable would nullify the commission's finding concerning the necessary rate of return). The problem was summarized in *General Telephone Co. v. Public Utilities Commission,* 174 Ohio St. 575, 191 N.E.2d 341, 344 (1963):

> There is no tax advantage [in an imputed capital structure] because the federal income tax law does not permit the deduction of hypothetical interest in computing income tax. The federal law allows for the deduction of only the amount of interest actually paid. To argue that this is a tax advantage is to assert, in simple words, that it is a tax advantage for a company to be allowed, as expense for income taxes, an amount less than the amount of taxes which it is actually required to pay under the law. It is evident that there is no tax advantage here, but rather a disadvantage which results in the [company's] annual dollar return to which it is entitled being reduced arbitrarily and either its statutory rate base, which has been determined and agreed upon, being reduced arbitrarily and unlawfully, or the annual fair rate of return which the commission has held it is entitled to receive being reduced arbitrarily and unlawfully.

{13} In past utility cases, this Court has said that the Commission has an obligation to allow a utility expenses that are necessary in providing utility service, that benefit ratepayers, and that are prudently incurred. *See General Tel. 1982,* 99 N.M. at 6, 653 P.2d at 506 (noting "[t]he Commission could not disallow prudent expenditures for essential telephone services since the telephone company [was] required to provide these services even

if" a loss resulted). In an analogous situation, this Court reviewed the decision of the Public Service Commission in denying recovery to a sole proprietor for tax expenses. *Moyston v. New Mexico Pub. Serv. Comm'n,* 76 N.M. 146, 157, 412 P.2d 840, 847 (1966) (stating all parties agreed "that income taxes imposed on an incorporated public utility are properly deductible as expenses for rate-making purposes"). In *Moyston,* this court held that the Commission's denial to a sole proprietor of a deduction for actual taxes which were higher than "hypothetical" taxes because she had not incorporated "denie[d] to the owner of the utility the right to select whether or not the operation is by a corporation or by a proprietorship, by reason of the denial of an allowance of state and federal income taxes." *Id.* at 158, 412 P.2d at 848. Similarly, the Commission's denial of recovery for Zia's tax expenses denies Zia the decision whether to operate at 100% equity, a decision clearly left to Zia by this Court's opinion in *Mountain States 1954,* 58 N.M. at 278, 270 P.2d at 696–97. It is plain that a higher federal income tax expense results from the lack of an interest expense deduction. The lack of debt in the capital structure would result in no interest expense. Thus, we conclude that the disallowance of this expense was arbitrary.

## V. OVERALL RATE OF RETURN, RETURN ON EQUITY, AND RETURN ON DEBT

{14} We next discuss the overall rate of return and its two components: the rate of return on equity and the rate of return on debt. Zia presented testimony that its existing rate of return on equity was 13%, far exceeding the 8.745% average return on equity of the eight comparable companies calculated by staff witnesses using the Discounted Cash Flow (hereinafter DCF) method. Zia contested the use of the DCF method. Zia argued for a higher rate of return on equity and the use of that higher rate of return on

its book value. Zia disagreed with the overall rate of return and the rate of return on equity claiming that neither rate was supported by substantial evidence. Zia also contested the use of an embedded cost of debt rather than a marginal cost of debt.

### A. Use of DCF Formula as Evidence of Return of Equity

{15} DCF is a market-based measure of return, meaning it assumes that the current market price of the stock incorporates all relevant information about investments in general and all information regarding the particular stock. The DCF "method determines the proper rate of return [on common equity] by adding to the common stock's current yield a rate of increase investors expect to occur over time." *State ex rel. Utils. Comm'n v. Public Staff,* 331 N.C. 215, 415 S.E.2d 354, 357 n. 1 (1992). The current price of the stock is reflective of all investment opportunities at the time.

{16} Under the DCF model used by the staff witnesses, the cost of equity for the eight comparison companies was calculated using the market price of the stock of each company, dividends of each company and the projected growth in dividends. The staff witnesses applied the DCF model to generate a cost of equity for the eight companies of 8.745%. One hundred basis points were added for perceived additional risk in Zia as compared to the other companies for a cost of equity of 9.745%. Having derived the cost of equity, staff witnesses imputed debt and preferred stock components to Zia's capital structure and arrived at a composite cost of capital, including both debt and equity, of 9.15%. This percentage was applied to the rate base to produce the dollar amount of the return on the rate base of $1,142,433.

{17} Throughout its case, Zia has argued for a higher rate of return on equity and the use of the book value [1] rather than the market value as the basis upon which such return should be calculated. "Book value [of stock]

1. *See F.H.T., Inc. v. Feuerhelm,* 211 Neb. 860, 320 N.W.2d 772, 778 (1982) (noting "[b]ook value, as applied to corporate stock, ordinarily means the net value shown on the corporate books of account of all assets of the corporation after deducting all liabilities"); *see also Smith v.*

*Fettin Roofing Co.,* 213 Neb. 184, 328 N.W.2d 470, 472 (1982) (defining "book value of the stock in a corporation [to mean] the figure obtained by dividing the difference between assets and liabilities by the number of outstanding shares of stock").

is the net assets divided by the number of outstanding shares." *Brown v. Halbert,* 271 Cal.App.2d 252, 76 Cal.Rptr. 781, 785 (1969). The "[m]arket value reflects the degree of confidence in potential earnings while net asset or book value disregards all but the present." *Bassett v. Neeld,* 23 N.J. 551, 130 A.2d 1, 4 (1957). Zia's witnesses analyzed the returns on book value. Despite the admission of Zia's expert, Robert S. Jackson, that the book value has not been equal to market value for natural gas distribution utilities for at least a decade, Zia persists with this argument on appeal. Zia contends that "over [an unspecified period of] time," presumably including the disastrous year 1929, the market value of a stock will tend to decrease and equal the book value. This economic argument assumes little or no sustained growth in the long run. In the case of the expected return and the market price, the forces of the market come strongly into play in order to create the true image of what investors are doing and therefore what the fair value is. There may be an urge to protect against a sudden and complete market failure and so to use the straight book value in computing the return on equity, but this was found unrealistic in today's market. Zia's evidence attacking the DCF model lacked relevance to current economic conditions.

{18} The DCF formula, which used market price and not book value, predicted dividend growth over the long run, was supported by substantial evidence and gave the Commission an indication of the appropriate rate of return on equity. The parties are in agreement that the DCF model is well-entrenched in this jurisdiction, having been in use for at least fifteen years. Also, while the rate base is calculated as the book value plus some additional adjustments, under DCF, the fair market value is used for the price of stocks. Staff witness Alan J. Girdner provided the rationale for these various facts in his testimony before the Commission: it is the return on their particular investment that concerns the individual investor and that drives the market. It is the expectation of a certain return which itself largely determines the real, current value of the stock and the company. This is what DCF, a *market-based* model, approximately measures. Commenting on the history of utility cases, in *Mountain States 1954,* 58 N.M. at 272–273, 270 P.2d at 693, we said, "[t]his Court can see no reason why it should adopt as the law of this state any single formula which has been evolved out of this history of litigation.... [T]he regulatory authorities seek a formula which will adjust rates to the *immediate economic situation* " (emphasis added).

{19} The decision whether to use the market value rather than the book value to evaluate return on equity is a decision which the Commission is capable of making. *See Public Service Co. v. New Mexico Pub. Util. Comm'n,* 1999–NMSC–040, ¶ 12, 128 N.M. 309, 992 P.2d 860. We hold that it is within the authority and discretion of the Commission to use the DCF formula, relying on recent economic circumstances and the data from the eight representative companies in this case. The Commission did so based on substantial evidence. *See Duke City,* 101 N.M. at 292, 681 P.2d at 718. The Commission's determination of cost of equity, and the resulting cost of capital, was based on substantial evidence.

## B. Return on Debt

{20} Zia contends that it was unreasonable and arbitrary for the Commission to determine that the rate of return on debt should be calculated on the imputed average embedded cost of debt. The imputed average embedded cost of debt is the average cost of additional debt for the eight comparison companies, or 8.57%. Thus, the embedded cost of debt used by the Commission was the amount a typical natural gas utility company with existing debt would pay to borrow more money. Zia presented evidence proposing that the Commission use the marginal cost of debt to determine the rate of return on debt. Marginal cost of debt represents the cost of debt if debt were issued to a debtor just entering the market under current interest rates. Zia argues the marginal cost of debt is the correct rate because Zia currently has no existing debt and 9% is the rate on a line of credit on which Zia could presently draw.

{21} The Commission used the embedded cost of debt calculation in attempt to find a reasonable rate and pursuant to Rule 630 Schedule G–3 of the Commission Rules. *See* New Mexico Pub. Util. Comm'n, *Code of Rules and Regulations,* Rule 630 Schedule G–3 (1988 Annot.) (rule effective June 30, 1988) [hereinafter NMPUC Rules]. In this instance, where a utility's capital structure is inconsistent with the average for its type and size, resulting in unnecessarily high rates, the Commission may determine the cost of debt as if the capital structure were average as long as decisions properly left to management are respected. Therefore it is reasonable and not arbitrary that the Commission rules provide for the use of embedded cost of debt. The Commission's use of an 8.57% rate of return on debt was based on substantial evidence and is not grounds for reversal.

## V. CASH WORKING CAPITAL

{22} Zia next argues that in setting rates the Commission's denial of any cash working capital was unsupported by substantial evidence, was contrary to its own regulations, and was a denial of procedural due process. To illustrate the concept of cash working capital, if one assumed that the utility paid for the natural gas before it supplied the natural gas to the consumer, then the utility would be using positive cash working capital, i.e., money from its investor, to pay for the natural gas until the consumer paid the utility. In that case, the investor would have an expectation of receiving a reasonable return on his investment. If, however, the consumer paid the utility in advance for use of the product, the company has negative cash working capital and the investor would have no expectation of return because his capital was not being used. This illustration of cash working capital is multiplied by thousands of customers and staggered billings to make the overall picture of cash working capital. Thus, for some utilities, cash working capital is an estimate of investor-supplied financing of operating costs during the time lag between the provision of utility services by the utility and the collection of revenue. Some utility companies use cash working capital to maintain their operations while awaiting payment from customers. Other utility companies bill their customers in advance. Both the Attorney General's witness, James D. Cotton and staff witness Steven D. Schwebke testified, and other courts have noted, *see, e.g., Porter v. Public Service Commission,* 333 S.C. 12, 507 S.E.2d 328, 335 (1998), that cash working capital may be a negative number. *See Barasch v. Pennsylvania Pub. Util. Comm'n,* 108 Pa.Cmwlth. 326, 530 A.2d 936, 937 (1987) (explaining that if investors supply funds to the utility to bridge the gap between the time the service is rendered and payment for that service is received, the utility has a positive cash working capital requirement, but where payment is received before the utility must satisfy a corresponding liability, the utility has a negative cash working capital requirement). In rate making, cash working capital is an estimate of the amount of money, to be included in the rate base, which investors supply to the utility company to cover operating costs during the time lag between the provision of utility services and the receipt of payment. In its application, Zia proposed to be awarded cash working capital on the basis of the so-called one-eighth rule, which allows a utility cash working capital equal to one-eighth of its yearly operating and maintenance expenses. This is in essence a rule of thumb which avoids the expense of a lead-lag study. It has generally been used for small utilities. Use of the one-eighth rule for Zia was roundly criticized by a staff witness and the Attorney General's witness who pointed out that a flat percentage method may be appropriate for smaller companies, but that with larger companies, because the yearly operating and maintenance expenses are much larger, one-eighth becomes an inflated number for cash working capital needs. Further, they testified that large utilities may have negative cash working capital needs. On this basis, all of Zia's requested $470,753 allowance for working capital in its rate base was denied.

{23} Another, more accurate method of determining cash working capital is the lead-lag study. A lead-lag study provides a mathematical picture of the utility's cash working capital situation whether positive or

negative. *See* NMPUC Rule 630.3(n). Zia's first argument is based on Schedule E–1 to Commission Rule 630, which provides that an applicant must show a computation for the allowance of cash working capital and that "[a]t the applicant's option a lead-lag study may be supplied to satisfy the requirements of this data request." NMPUC Rule 630 Schedule E–1. The Commission's rules do not require a lead-lag study unless the company is specifically directed otherwise. The rules also do not preclude large utilities from using the one-eighth rule. In this context, Zia relies on *General Tel. 1982*, 98 N.M. at 755, 652 P.2d at 1207 (stating use of a 1/36th multiplier of operating expenses as a method of determining cash working capital in order to avoid a lead-lag study would be allowed to avoid departure from past practice). *But see Colorado Mun. League v. Public Utils. Comm'n*, 687 P.2d 416, 419–21 (Colo.1984) (concluding substantial evidence supported finding of zero cash working capital where utility requested one-twelfth of its operating expenses as cash working capital and utility staff witnesses recommended zero cash working capital).

{24} The Hearing Examiner also noted that in Hobbs Gas Company's last litigated rate case, before its assets were acquired by Zia, a lead-lag study was done for Hobbs and Hobbs was informed by the Commission that "in future rate cases, Hobbs should file a lead-lag study if it seeks a positive cash working capital allowance." Zia claims it was not on notice because it merely acquired the assets of Hobbs and not the entire organization (apparently certain tax liabilities and assets were excluded). Commission Rule 630, Schedule E–1, requires that a company be given adequate notice if a lead-lag study is going to be required in a rate case. *See General Tel. Co. 1982*, 98 N.M. at 755, 652 P.2d at 1206 (holding the state corporation commission was bound by its rules and established methods of rate making absent a change in circumstances). The Commission rules did not give notice to Zia that it would be required to perform a lead-lag study.

{25} Absent evidence in the record that the formula approach inaccurately represented Zia's expenses, as opposed to testimony about the theoretical use of the formula approach with large utilities generally, it does not appear that the Commission relied on substantial evidence in awarding no cash working capital. Although we review the record as a whole and we review it in the light most favorable to the Commission's decision, we do not find substantial evidence in the record to support the Commission's decision on cash working capital.

## VI. AIRPLANE EXPENSE

{26} The burden of proving the reasonableness, as an operating expense to be included in the rate base, of expenses associated with the use of an airplane, was on Zia. NMSA 1978, § 62–8–7(A) (1991 prior to 1998 amendment), *see Otero County Elec. Coop. v. New Mexico Pub. Serv. Comm'n (In re Otero County Elec. Coop.)*, 108 N.M. 462, 465, 774 P.2d 1050, 1053 (1989) (stating utility is in the best position to explain fairness of proposed metering scheme). Zia presented evidence to the Commission that commercial flight time to any of three destination cities in New Mexico was one day and that the private plane could make the trip in three hours. Zia showed the commercial fare from Worland, Wyoming to Hobbs, New Mexico was $1165, and that there are typically between two and four, and sometimes five employees on the company's plane. At the time of filing, Zia had owned a new plane only for a few months. Thus the relevant reported expenses pertained to an older plane and totaled $32,792. To justify allocation for the new plane, Zia estimated 300 hours of flight time for the year at $700 an hour, the charter rate for the new plane. After applying an allocation factor among the units of Zia some of which are outside New Mexico, the amount attributable to the New Mexico unit of the utility was $155,308, according to Zia. The staff witness used figures of 400 hours (the number of hours flown by the prior aircraft) and $350 (the hourly charter rate for a plane of the older type) for a recommended expense of $140,000. Despite this, the Commission Order allowed only $24,252.96, the portion of the $32,792 attributable to use in New Mexico.

{27} The hearing officer recommended $140,000 in aircraft expenses. Zia argues that the deletion of over $115,700 from these aircraft expenses is not supported by substantial evidence and is a denial of due process. Zia's due process argument is that the commission should have been limited to exactly the same type of finding concerning aircraft expense that was used in Zia's last rate-making procedure. Zia presented proof of both commercial airline ticket costs and per-hour charter rates as evidence of the reasonableness of its aircraft expense. Use of a per-hour charter rate was not incumbent on the Commission and could be judged more probative in one case than in another. We note the prior case was a stipulated case and the present one is not. Thus there was no denial of due process.

{28} In its Order, the Commission stated that if Zia is to recover the costs of owning and operating its new aircraft in a future rate case, Zia will have to provide certain information, including a log of all travel (business and non-business) showing all passenger names, destinations, dates and business purposes of all trips, each leg of multi-destination trips, any leasing of the aircraft to others, or any other aircraft activity resulting in economic benefit to Zia. In any future rate case, Zia is to request approval to place the purchase of its new aircraft in the rate base, allocate it by state, prove that the purchase saves money over commercial flights and that it benefits ratepayers, and prove actual expenses and aircraft use.

{29} We said in *State ex rel. Sandel v. New Mexico Public Utility Commission*, 1999–NMSC–019, ¶ 15, 127 N.M. 272, 980 P.2d 55, that the Public Utility Commission is vested with considerable discretion in determining the justness and reasonableness of utility rates. We believe this discretion includes the power to refuse a utility operating in New Mexico an airplane as an operating expense unless the Commission is provided with details as to the need therefor and the use thereof, including a cost-benefit analysis, and not just an estimate of hours of use and the per-hour cost of a charter. However, there was nothing in the record in this case to support the conclu-sion reached by the Commission which departed from the Recommended Decision of the Hearing Examiner. All of the figures proposed by the parties were higher amounts than the figure reached by the Commission, which happened to be the same as that spent on the older plane multiplied by the percentage of use allocated to the New Mexico unit. Thus, even though it may require a cost-benefit analysis in the future, the Commission's conclusion was not based on substantial evidence.

{30} The portion of the new airplane cost which Zia allocated to Zia utility customers was $155,308. Staff witnesses argued this figure should be reduced to $140,000 based on a lower per-hour charter rate. In its Brief in Chief to the Commission, Zia accepted the lower figure of $140,000. The Commission's order for $24,252.96 in aircraft expense was not based on substantial evidence.

## VII. CONCLUSION

{31} Having found the Commission's decision on the disallowance of Zia's actual tax expenses to have been arbitrary, the determination of zero cash working capital to have been lacking a basis in substantial evidence and the award of $24,252.92 in aircraft expenses to have been unsupported by substantial evidence, we vacate the order in toto and remand this matter to the Commission.

{32} **IT IS SO ORDERED.**

MINZNER, C.J., BACA and FRANCHINI, JJ., concur.